# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JIMMY KINSLOW,

                         Plaintiff,

          v.                                                    CV 05-1324 JH/WPL

JOE WILLIAMS, ET AL.,

                         Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Jimmy Kinslow filed this civil rights suit against several officials affiliated with the New Mexico Corrections Department (the NMCD Defendants), several other officials affiliated with the Illinois Department of Corrections (the IDOC Defendants), and Partha Ghosh, the Medical Director of the Stateville Correctional Center (SCC) in Illinois.[1]  The case is before me now to review several motions and a *Martinez* report.

Kinslow has filed a motion for partial summary judgment and two motions to compel. Pursuant to my order, the NMCD Defendants have filed a *Martinez* report regarding Kinslow's claims against them.  Within their *Martinez* report, the NMCD Defendants move for dismissal or summary judgment in their favor because Kinslow failed to exhaust his administrative remedies and because one of Kinslow's classification claims raises no federal constitutional issue.  I will recommend that

---

[1] The NMCD Defendants are: Joe Williams, Secretary of Corrections; Erma Sedillo, Deputy Secretary of Corrections; Tim LeMaster, Deputy Director of Adult Prisons; Elmer Bustos, Division Director of Adult Prisons; Nick DeAngelo, NMCD General Counsel; James Brewster, NMCD Deputy General Counsel; Gilbert Garcia, NMCD Classification Bureau Chief; and Frank Pullara, NMCD Medical Director.  The IDOC Defendants are: Barbara Hurt, Deputy Director of Division 1; Kenneth Briley, SCC Warden; Willard Elyea, IDOC Medical Director; and Diann K. Marsalek, IDOC Chief Legal Counsel.

all of these motions be denied, but that summary judgment be granted *sua sponte* in the NMCD Defendants' favor on several of Kinslow's claims.

## KINSLOW'S CLAIMS

In his verified complaint, Kinslow alleges that he was sentenced by a state court in New Mexico to life in prison. (Doc. 1 at 5.) In 1995, he was transferred to Illinois pursuant to the Interstate Corrections Compact (ICC), and in 2000, he became ill with a life-threatening liver disease. Kinslow filed two civil rights suits against IDOC officials, claiming that he was not receiving proper medical treatment. (*Id.*) According to the complaint, "certain NMCD official(s) were also named as defendants" in one of these suits. (*Id.*) In August 2004, the suits were settled. (*Id.* at 6.)

Kinslow alleges that between January and October 2004, all of the defendants entered into a conspiracy to punish him for filing his civil rights suits. (*Id.* at 6-7.) In October 2004, Kinslow was transferred back to New Mexico, assigned a Level VI classification, and placed in administrative segregation, where he remains to this day. (*Id.* at 7-9.) Kinslow claims that he has been denied the opportunity provided to all other inmates to advance his way out of administrative segregation and into a higher classification level. (*Id.* at 10.) He also alleges that every time he is taken out of his cell, he is "led around at the end of an attached 'DOG LEASH.'" (*Id.* at 11.) He asserts that all of this has been done in retaliation for his filing and winning the civil rights suits. (*Id.* at 7-11.)

Kinslow asserts that some of the NMCD and IDOC Defendants further retaliated against him by conspiring to keep all of his personal and legal files in Illinois. (*Id.* at 11.) Kinslow believes that this was done to deny him meaningful access to the Illinois federal court by preventing him from properly challenging violations of the settlement agreement. (*Id.*)

2

Kinslow additionally claims that all of the defendants are retaliating against him by denying him proper and necessary medical treatment and tests. He states that shortly before his transfer to New Mexico, Dr. Coltran, his consulting physician in Illinois, recommended that several diagnostic tests be performed to screen him for Crohn's disease and colo-rectal cancer. (*Id.* at 13-14.) Kinslow was transferred before any of the tests could be performed, and the NMCD Defendants are now refusing to perform the tests or even to acknowledge receipt of Dr. Coltran's recommendations. (*Id.* at 14.)

Finally, Kinslow claims that the treatment of his liver disease failed because of the interruption in treatment when he was transferred, resulting in extreme pain and a shortened life expectancy. (*Id.*)

Kinslow asserts seven causes of action. In count one, he alleges a conspiracy to retaliate against him for filing the previous civil rights suits. (*Id.* at 15.) In count two, he alleges retaliation for filing the previous civil rights suits. Within this count, Kinslow also asserts that the use of the dog leash violates his constitutional rights. (*Id.* at 15-16.) In count three, Kinslow claims that all of the defendants violated the settlement agreement. (*Id.* at 16.) In count four, he asserts that most of the NMCD Defendants are retaliating against him and violating his right to equal protection by denying him the opportunity to advance within the prison classification system. (*Id.* at 16-17.) In count five, he asserts that these same NMCD Defendants are denying him due process by refusing to follow policies regarding classification and administrative segregation and by retaliating against him by keeping him at Level VI and in administrative segregation. (*Id.* at 17.) In count six, he asserts that most of the defendants retaliated against him by denying him access to the courts. (*Id.*) And in count

seven, he raises a deliberate indifference claim against all of the defendants for interrupting and interfering with his medical treatment.[2] (*Id.* at 17-18.)

## SOVEREIGN IMMUNITY

Kinslow has sued the NMCD Defendants in their individual and official capacities, seeking declaratory, injunctive, and monetary relief.  A court must dismiss the claims of a prisoner who is proceeding *in forma pauperis* if the court determines "at any time" that the prisoner is seeking monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915(e)(2)(b)(iii); *Trujillo v. Williams*, 465 F.3d 1210, 1223 (10th Cir. 2006).  To the extent that Kinslow seeks retroactive monetary relief against the NMCD Defendants in their official capacities, his claims are barred by sovereign immunity.  *See Trujillo*, 465 F.3d at 1223-24.  Therefore, these claims should be dismissed with prejudice.  *See id.* at 1224.

## SUMMARY JUDGMENT STANDARDS

Summary judgment should be granted when the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  Cross motions for summary judgment are treated separately, so that the denial of one does not require the granting of the other.  *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, ___ F.3d. ___, ___ 2007 WL 1041401, at *5 (10th Cir. 2007).  When the parties file cross motions, summary judgment is inappropriate if disputes remain as to material facts.  *Id.*  But when the facts are not in dispute and the parties only disagree about whether the actions were constitutional, summary judgment is appropriate.  *Id.*

---

[2] Kinslow additionally asserts that the first, second, and seventh counts constitute several state-law torts, such as conspiracy, assault and battery, and medical malpractice.  (*Id.* at 15-16, 18.)

4

The record and all reasonable inferences therefrom must be viewed in the light most favorable to the nonmovant. *See Muñoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000). A court cannot resolve material disputed factual issues by accepting a *Martinez* report's factual findings when they are in conflict with pleadings or affidavits. *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). A bona fide factual dispute exists even when the prisoner's factual allegations that are in conflict with the *Martinez* report are less specific or well-documented than those contained in the report. *Id.* However, conclusory allegations without specific supporting facts have no probative value. *See Fitzgerald v. Corr. Corp. of America*, 403 F.3d 1134, 1143 (10th Cir. 2005); *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992).

Summary judgment may not be predicated on unsworn statements in a *Martinez* report. *See Hayes v. Marriott*, 70 F.3d 1144, 1147-48 (10th Cir. 1995). Hearsay is inadmissible in a summary judgment proceeding to the same extent that it is inadmissible in a trial, except that affidavits are admissible in a summary judgment proceeding to establish the truth of what is attested. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Affidavits must be made on personal knowledge, must set forth facts that would be admissible in evidence, and must show that the affiant is competent to testify to the matters stated in the affidavit. FED. R. CIV. P. 56(e). "[T]he court may disregard facts supported only by references to documents unless the parties have stipulated to the admissibility of the documents or the documents have been authenticated by and attached to an affidavit meeting the requirements of Rule 56(e)." *Conoco Inc. v. J.M. Huber Corp.*, 148 F. Supp. 2d 1157, 1166 (D. Kan. 2001), *aff'd*, 289 F.3d 819 (Fed. Cir. 2002). It is well established that a party cannot rely on unauthenticated documents in a summary judgment proceeding. *IBP, Inc. v. Mercantile Bank of Topeka*, 6 F. Supp. 2d 1258, 1263 (D. Kan. 1998).

5

A court may enter summary judgment *sua sponte* based on a *Martinez* report, as long as the parties were on notice that they had to come forward with all their evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *Hall*, 935 F.2d at 1109-13. The Order to File a *Martinez* Report informed the parties that the *Martinez* report might be used in deciding whether to grant summary judgment, either by motion or *sua sponte*, and that they should accordingly submit whatever materials they consider relevant to Kinslow's claims. (Doc. 81 at 6.) The Order also stated, "**Documents supporting the report must be submitted in a form that would allow the Court to use them in deciding a summary judgment motion. The NMCD Defendants must submit affidavits in support of the report if necessary.**" (*Id.* at 5 (emphasis in original).) Following this statement, the order cited two cases that discuss the proper form of summary judgment proof. *See Hayes*, 70 F.3d at 1147-48; *Farmers Alliance Mut. Ins. Co. v. Naylor*, 452 F. Supp. 2d 1167, 1176-77 (D.N.M. 2006). Despite the instructions in the Order, the *Martinez* report is deficient in many respects, as explained below.

## EXHAUSTION

Shortly after Kinslow filed his complaint, Magistrate Judge Schneider ordered him to show cause why it should not be dismissed for failure to exhaust all of his claims. (Doc. 9.)[3] Kinslow responded with an affidavit stating that he filed a grievance on November 22, 2004. (Doc. 11 at 1.) Although the grievance officer apparently answered the grievance on November 29, 2004, Kinslow

---

[3] This order was entered pursuant to *Steele v. Fed. Bureau of Prisons*, 355 F.3d 1204, 1210 (10th Cir. 2003), which required prisoners to plead exhaustion and either attach copies of the administrative dispositions or describe the administrative proceedings with specificity. Earlier this year, the Supreme Court abrogated *Steele* and held "that failure to exhaust is an affirmative defense . . . , and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 127 S. Ct. 910, 921 (2007).

did not receive the answer, so on January 30, 2005, he appealed to the warden.  When the warden

failed to respond, he appealed to the Secretary, who also failed to respond.  (*Id.*)  Kinslow

additionally averred that on March 30, 2005, he filed another grievance and again did not receive a

response at the initial levels.  On June 29, 2005, Deputy Secretary of Corrections Sedillo denied the

grievance.  (*Id.* at 1-2.)

Kinslow provided copies of the purported grievances and responses, along with other

documents.  (Doc. 12.)  In the November 22, 2004 grievance, Kinslow complained that he was

transferred to New Mexico and placed in administrative segregation in violation of the settlement

agreement and as part of a conspiracy to retaliate against him for filing his civil rights suits.  He also

complained about the failure to send him for the tests recommended by Dr. Coltran and the loss of

his legal files.  (*Id.*)

The grievance officer's November 29, 2004 response refers to "Grievance File # 04-11-06"

and states:

> In review of your grievance I was not sure what you were talking about and while
> talking to Officials at the Department of Corrections, Central Office in Santa Fe, I
> discovered that you were transferred back to the State of New Mexico due to medical
> needs.  The information I received was that this facility Southern New Mexico
> Correctional Facility and Central New Mexico Correctional Facility were the only two
> Facilities in the State that could meet the required treatment that you require [sic].
> As for the court order that you received while in the State of Illinois, I'm not sure that
> their ruling pertains to this State or if they can in fact impose [sic] this Department to
> the settlement.
>
> Either way this matter is beyond the level of a grievance office.

(*Id.*)

Kinslow's March 30, 2005 grievance complained about the failure to respond to previous

grievances, reiterated the complaints in the November 22, 2004 grievance, and added complaints

regarding the use of the dog leash, failure to follow classification policies, and the negative effects

on his health resulting from the transfer.  (*Id.*)  In a memorandum dated June 29, 2005, Sedillo wrote:

> Denied: This is in response to your grievance/grievance appeal concerning your
> medical treatment and the grievance procedures.  You have not followed procedural
> requirements . . . for filing a grievance and/or a grievance appeal; therefore this
> grievance/grievance appeal is denied.  The initial investigation into your medical
> treatment has been addressed by Wexford Medical Services.  It would be an inefficient
> use of time and resources to repeatedly respond to the same issues.  As, such, [sic]
> there will be no further response.

(*Id.*)

Kinslow also provided documents regarding his classification, including a document entitled

"Appeal of Level V or Level VI Placement or Retention Decision" and a December 16, 2004 memo

from Director of Adult Prisons Bustos affirming Kinslow's placement in Level VI.  (*Id.*)  Upon

review of all of these materials, Judge Schneider issued an order discharging the show cause order,

but stating that the defendants were not precluded from raising lack of exhaustion as a defense.  (Doc.

13.)

In the Order to File a *Martinez* Report, I instructed the NMCD Defendants to provide

information regarding exhaustion, including a statement as to whether they believed Kinslow's claims

were exhausted, the steps required to exhaust administrative remedies regarding the claims asserted

by Kinslow, copies of applicable policies, and copies of any grievances, classification appeals, or other

complaints submitted by Kinslow.  (Doc. 81 at 5.)

The *Martinez* report initially states that Kinslow failed to exhaust his administrative remedies

because he did not file a grievance raising the claims in this suit until 2006, which was after this suit

was filed.  (Doc. 95 at 8.)  The report states, "There is no record held by the Department that Mr.

Kinslow filed any other grievance on these issues."  (*Id.*)  The report then states that Kinslow sent

the NMCD Defendants' attorney copies of grievances that he claimed were filed but unanswered. These documents, which are attached as exhibits 34 and 35 to the *Martinez* report, include the November 22, 2004 and March 30, 2005 grievances that Kinslow previously submitted to the Court in response to the show cause order. Although copies of these grievances have been on file with the Court since March 2006, the NMCD Defendants request "leave of the Court, or to be ordered by the Court, to further investigate this issue and supplement this report with any further documentation or affidavits since these materials were provided on the eve of filing this report." (*Id.*) In the portion of the report devoted to their summary judgment motion, the report states, "There is a question remaining as to if these documents were truly submitted through the grievance procedure" and that "one final grievance officer is yet to answer questions" about the grievances. (*Id.* at 11.)

There are several problems with the documentation in the *Martinez* report regarding exhaustion. The exhibits include written policies and memoranda, none of which have been

As part of his response to the *Martinez* report, Kinslow has submitted another affidavit, again detailing his filing of the November 22, 2004 and March 30, 2005 grievances and the responses to those grievances. (Doc. 102.)[4]

Because the failure to exhaust administrative remedies is an affirmative defense, the NMCD Defendants bear the burden of proving that Kinslow did not exhaust his administrative remedies. *Jones*, 127 S. Ct. at 919-21; *Roberts v. Barreras*, ___ F.3d ___, ___, 2007 WL 1113956, at *4 (10th Cir. 2007). They have not met this burden.

There are several problems with the documentation in the *Martinez* report regarding exhaustion. The exhibits include written policies and memoranda, none of which have been

---

[4] Kinslow attached additional pages to the grievance forms to explain his complaints. Although they contain the same complaints, the additional pages attached to the March 30, 2005 grievances that were included with the *Martinez* report and with Kinslow's affidavit in response to the *Martinez* report are different from the additional pages attached to the March 30, 2005 grievance that was submitted in response to the show cause order.

authenticated.  (*See, e.g.*, Doc. 98 Ex. 31-33, 39-43.)  The grievance policy attached to the *Martinez* report states that it does not apply to classification decisions and that a separate appeal process is provided for these decisions and for placement in Level VI.  (*Id.* Ex. 31a.)  The narrative portion of the report does not refer to or describe the appeal process for classification decisions and I cannot locate a copy of the policy in the exhibits.

The narrative portion of the *Martinez* report states that besides the 2006 grievance, there "is no record held by the Department that Mr. Kinslow filed any other grievance on these issues" and that the attorney who prepared the report "was advised by the Grievance Officer at Southern New Mexico Correctional Facility that there are no other grievances filed by Mr. Kinslow."  (Doc. 95 at 8.)  These statements are unsworn and the second statement would be hearsay even if  it were sworn.  No affidavit from a corrections official has been provided.[5]

Furthermore, the narrative portion of the report is inconsistent with the exhibits.  Although the narrative portion states that there is no record that Mr. Kinslow filed any grievance on these issues other than the 2006 grievance, it is clear from reviewing the exhibits to the *Martinez* report that Kinslow filed grievances raising at least some of the issues in this suit before 2006.  For example, the exhibits include the November 29, 2004 memorandum from the grievance officer and the June 29, 2005 memorandum from Sedillo, both of which Kinslow previously provided to the Court.  (Doc. 98

_____

[5] The *Martinez* report does include an NMCD general manager's affidavit, which was obviously prepared for purposes of different litigation involving Kinslow.  (The affidavit's caption refers to the Northern District of Illinois.)  (Doc. 98 Ex. 2.)  The affidavit states that Kinslow failed to exhaust the issues raised in that litigation because he did not appeal an initial decision on a grievance. The Illinois litigation did not involve all of the claims at issue here.  *See Kinslow v. TransCor America, LLC*, No. CIV A 06 C 4023, 2006 WL 3486866, at *1-2 (N.D. Ill. Dec. 1, 2006) (unpublished).  The general manager did not state that the grievance referred to in the affidavit is the only grievance that Kinslow has ever filed.

Ex. 40, 44.)  Both of these memoranda refer to grievances filed by Kinslow.  The exhibits also include documents demonstrating that Kinslow appealed his placement in Level VI.  (*Id.* Ex. 5-6.)[6]

In contrast to the NMCD's *Martinez* report, Kinslow has provided affidavits that detail his attempts to exhaust his administrative remedies.  In his affidavit in response to the *Martinez* report, Kinslow states that he filed the November 22, 2004 and March 30, 2005 grievances and that he appealed the grievances through every level of review when he received no response.  (Doc. 102.)  The grievance policy attached to the *Martinez* report provides that expiration of the time limit at each level entitles the prisoner to appeal to the next level and that if a grievance is not disposed of within ninety days, the prisoner is deemed to have exhausted his administrative remedies.  (Doc. 98 Ex. 31a.)  The policy further states that if a grievance is ruled non-grievable at any level, that decision cannot be appealed.  (*Id.*)  Thus, even if the *Martinez* report had been properly prepared, Kinslow's affidavit would create a factual dispute regarding exhaustion.  Therefore, the NMCD Defendants' motion for summary judgment based on lack of exhaustion should be denied.[7]

_____

[6] In the summary judgment portion of the *Martinez* report, counsel expresses confusion about the exhaustion issue and states that he "does not want to mislead the court."  (Doc. 95 at 11-12.)  I am confident that counsel has not attempted to mislead the Court.  However, the *Martinez* report raises serious questions regarding prison record-keeping.  According to the written policy attached to the report, "Records regarding the filing and disposition of all grievances will be collected and maintained systematically by the Grievance Officer at each institution . . . ."  (Doc. 98 Ex. 31b.)  The grievance officer is required to keep a copy of every completed grievance for a minimum of three years, as well as a status log that tracks every grievance.  (*Id.*)  Based on the *Martinez* report, it appears that these policies have not been followed.

[7] The grievance policy requires a separate grievance form for each issue grieved.  (Doc. 98 Ex. 31b.)  Kinslow's purported grievances arguably violated this requirement, although he argued in his March 30, 2005 grievance that "[w]hile it would appear to be multiple issues at first glance, all are in reality stemming from one single issue – <u>RETALIATION FOR FILING PREVIOUS LAWSUITS</u>."  (Doc. 12.)  The NMCD Defendants have not argued that Kinslow violated this requirement.  Nor have they argued that he failed to exhaust his administrative remedies because he failed to comply with "procedural requirements" as stated in Sedillo's June 29, 2005 memorandum.

## VIOLATION OF THE SETTLEMENT AGREEMENT

Kinslow asserts in count three of his complaint that all of the defendants violated the agreement that settled the Illinois civil rights suits.  Summary judgment should be granted in favor of the NMCD Defendants on this claim for two reasons: 1) there is no evidence that any of the NMCD Defendants were parties to the settlement agreement; and 2) even if they were parties to the agreement, there is no evidence that they violated it.

To establish that the NMCD Defendants were parties to the settlement agreement, Kinslow relies on the "Federal Rule 41 Stipulation to Dismiss" in Case No. 01-466-DRH in the Southern District of Illinois.  The caption of this document describes the defendants as "Donald Snyder, Jr., et al."  The text of the document lists the defendants by name, but does not include any of the NMCD Defendants in this case.  The document states that the parties "stipulate pursuant to the terms of the settlement agreement reached on August 27, 2004, before Magistrate Schenkier . . . to the dismissal of this entire case as to all claims against all parties . . . ."  (Doc. 108 Ex. 12.)  The document was signed by James Brewster, NMCD Deputy General Counsel, as "Counsel for Certain Defendants." (*Id.*)

Kinslow has also submitted a transcription of the August 27, 2004 settlement conference, where Judge Schenkier stated the terms of the agreement in open court. (Doc. 7 Ex. A.)  The transcript does not name the defendants in the suits, but it does contain the names of the defendants who were represented at the settlement conference.  No one entered an appearance for any of the NMCD Defendants at the conference.  Brewster's name is not mentioned.  (*Id.* at 1-3.)

In response to a motion for sanctions filed in this case by Kinslow, the NMCD Defendants submitted an affidavit by Brewster. (Doc. 57 Ex. 7.)[8] The affidavit indicates that he represented John Shanks in the Illinois litigation. (*Id.*) Shanks is not a defendant in this case. Attached to Brewster's affidavit is a copy of the settlement agreement, which names Shanks as a party to the agreement. It does not name any of the NMCD Defendants as parties. It was not signed by Brewster or any of the other NMCD Defendants. (*Id.*)

From this review of the record there is clearly no evidence that the NMCD Defendants were parties to the settlement agreement. The mere fact that one of the NMCD Defendants—Brewster—signed the stipulation of dismissal as attorney for "Certain Defendants" does not establish that any of the defendants in this case were defendants in the prior cases. Moreover, there is nothing in the transcript of the settlement conference to indicate that the NMCD Defendants agreed to the settlement terms. On the other hand, Brewster's affidavit and the attached copy of the settlement agreement demonstrate that the NMCD Defendants were not parties to the agreement.

Even if the NMCD Defendants were parties to the settlement agreement, there is no evidence that they violated its terms. Kinslow asserts that the NMCD Defendants violated the agreement by their "failure to not transfer [him] until completion of medical treatments, the refusal to work together

---

[8] Although this affidavit was not included with the *Martinez* report, it may be considered in deciding whether summary judgment is appropriate. *See Stanko v. Maher*, 419 F.3d 1107, 1114 n.7 (10th Cir. 2005); *see also* 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2722 ("An affidavit of a party that is on file in the case will be considered by the court regardless of the purpose for which it was prepared and filed. Thus, an affidavit submitted to support another motion may be taken into account on a motion for summary judgment.").

in placing [him] in the agreed-upon States or to perform the required medical diagnostic testing."

(Doc. 1 at 16.)

According to the transcript of the settlement conference, Judge Schenkier recited the terms

of the agreement in open court, and all parties who were present agreed that the terms he recited

were correct.  (Doc. 7 Ex. A at 4-9.)  Judge Schenkier stated:

> One term of the agreement is that Mr. Kinslow will be put on a medical hold for
> purposes of transfer from Stateville to any other institution within the Department of
> Corrections system in Illinois, meaning that he will not be transferred by the
> Department from Stateville to another institution in Illinois until his current course of
> treatment has been completed which is currently, I think, scheduled to be completed
> in about the spring of next year.
>
> Another term of the agreement is that the Department will assist Mr. Kinslow
> in his efforts to obtain a transfer by the New Mexico authorities who have control
> over his incarceration to a facility either in Wisconsin, Iowa or Alabama, which Mr.
> Kinslow has identified as states where the medical treatment may be very good for the
> type of condition that he has.  This agreement obligates the Department to work with
> Mr. Kinslow to try to facilitate a transfer to one of those states.  The agreement does
> not guarantee a result because it's not within the control of the Department as to
> whether either New Mexico approves that transfer or whether those states accept a
> transfer, but the Department will use its efforts to cooperate in attempting to make
> it happen.

(*Id.* at 5.)  Judge Schenkier also stated that Kinslow would have a meeting with Dr. Ghosh and

Warden Briley within fourteen days to discuss his treatment.  (*Id.* at 6.)

The copy of the  settlement agreement attached to Brewster's affidavit states:

> While Jimmy Kinslow is within Illinois under the interstate compact agreement,
> Plaintiff will remain at Stateville Correctional Center on a medical hold while
> undergoing medical treatment which is anticipated to be completed in Spring, 2005.
> Plaintiff is subject to return to New Mexico under the interstate compact agreement,
> which supersedes any Illinois medical hold.

14

(Doc. 57 Ex. 7.)  The agreement also states that the IDOC would "recommend that plaintiff be transferred either Wisconsin, Iowa or Alabama [sic].  However, this does not guarantee a transfer to Wisconsin, Iowa or Alabama.  Any transfer of plaintiff is within the sole discretion of the State of New Mexico."  (*Id.*)  The agreement further provides that the IDOC "will assist plaintiff in arranging a meeting between the Warden and Dr. Ghosh within fourteen days.  There is no guarantee to the treatments or that the items discussed will be provided."  (*Id.*)  Finally, the agreement states that no promise was made to give Kinslow "any greater or further consideration" than what is stated in the agreement, that no other express or implied agreements or representations have been made, and that any changes to the agreement must be made in writing.  (*Id.*)

From this review of the settlement agreement, it is apparent that the NMCD Defendants could not have violated the agreement as alleged by Kinslow.  The agreement did not forbid the NMCD Defendants from transferring him before the completion of his treatment; rather, it expressly recognized the NMCD's power to transfer him at any time.  Nor did the agreement place any responsibility on the NMCD Defendants to attempt to place Kinslow in the agreed-upon states.

As for the failure "to perform the required medical diagnostic testing," there is no evidence that the NMCD Defendants agreed to perform any tests.  Kinslow asserts in his complaint that he, Briley, Marsalek, and Ghosh attended the meeting referred to in the settlement agreement and that at that meeting, "it was agreed to by ALL PARTIES (including the NMCD defendants)" that he would receive the tests recommended by Dr. Coltran.  (Doc. 1 at 13-14.)  The agreement, however, provided only that a meeting would occur and made no guarantee that any treatment discussed at the meeting would be provided.  Any changes to the agreement must be made in writing, and there is no

evidence that a written modification was ever made. Kinslow's assertion that the NMCD Defendants agreed to perform the tests, though verified, is conclusory and thus insufficient to raise a factual dispute on this issue. Moreover, Kinslow fails to explain how the NMCD Defendants could have agreed at the meeting to perform the tests, when he does not allege that anyone representing the NMCD Defendants attended the meeting.

### TRANSFER TO NEW MEXICO

Kinslow claims that his transfer to New Mexico resulted from a conspiracy to retaliate against him for filing the civil rights suits. He has moved for summary judgment in his favor on this claim.

Prison officials may not transfer a prisoner to a different institution in retaliation for his exercising his right of access to the courts. *Frazier v. Dubois*, 922 F.2d 560, 561-62 (10th Cir. 1990); *Smith v. Maschner*, 899 F.2d 940, 947-48 (10th Cir. 1990). To prevail on a retaliatory transfer claim, the prisoner must prove that but for the retaliatory motive, he would not have been transferred. *See Smith*, 899 F.2d at 949-50.

To establish the conspiracy to retaliate, Kinslow relies on an affidavit by Pullara, his own affidavit, and the sequence of events. Pullara avers in his affidavit that he is the medical director for the NMCD and that when an inmate is transferred to a different state, the NMCD must pay for the inmate's off-site medical treatment. (Doc. 108 Ex. 1.) According to the affidavit, Elyea, the IDOC medical director, called Pullara to discuss Kinslow's medical condition in September 2004. Pullara states:

> It was my distinct impression that Dr. Elyea advised me that the Illinois
> Department of Corrections officials actually wanted Mr. Kinslow removed from their
> facility and potentially returned to New Mexico. Based on the conversation with Dr.
> Elyea, I felt that Inmate Kinslow should be returned to New Mexico for medical

16

> treatment and monitoring.  I felt that it would be more economical to have Inmate
> Kinslow return to New Mexico, based on our agreements with local hospitals and
> facilities for treatment of inmates.

(*Id.*)  Pullara then informed an NMCD general manager that Kinslow should be returned to New

Mexico.  (*Id.*)[9]

Kinslow believes that the first sentence quoted above supports his claim of a conspiracy to

retaliate.  Assuming that the sentence is not hearsay, *see* FED. R. EVID. 801(d)(2), and accepting it

as true, the fact that "the Illinois Department of Corrections officials actually wanted Mr. Kinslow

removed from their facility and potentially returned to New Mexico," does not establish that *the*

*NMCD Defendants* had any retaliatory intent in having Kinslow transferred to New Mexico.  Nor

does the mere fact that the two doctors discussed Kinslow's condition establish a conspiracy.  Pullara

goes on to say that he decided to have Kinslow transferred to New Mexico because his treatment

would be more economical in this state.  This is a non-retaliatory basis for the transfer.

In his affidavit, Kinslow states that a unit manager told him that he was transferred back to

New Mexico because of the lawsuits he had filed.  (Doc. 103 at 3.)  This statement is arguably

hearsay that cannot be used as summary judgment proof.  *See Argo v. Blue Cross & Blue Shield of*

*Kan.*, 452 F.3d 1193, 1199 (10th Cir. 2006); *Brown v. Sales*, No. 97-6097, 1997 WL 687727, at *1

(10th Cir. Oct. 31, 1997) (unpublished) ("Mr. Brown's statement that he was informed by a case

manager that Defendant Sales would eventually have him transferred for filing lawsuits . . . would be

---

[9] This affidavit was prepared for other litigation in the Northern District of Illinois.  Kinslow has
submitted a copy of the affidavit that was filed in that district.  It bears Pullara's signature and a notary's seal.
(Doc. 108 Ex. 1.)  The NMCD Defendants also rely on Pullara's affidavit.  The copy they submitted contains
the same averments but has no signature or seal.  (Doc. 95 Ex. 1.)

17

inadmissible at trial and is not sufficient to avoid summary judgment."). *But see* FED. R. EVID. 801(d)(2)(d) (providing that a statement is not hearsay if it was made by a party's agent or servant concerning a matter within the scope of the agency or employment). In any event, the statement does not implicate the NMCD Defendants and is consistent with Pullara's recollection that the IDOC Defendants wanted Kinslow transferred back to New Mexico.

Pullara's affidavit states that Elyea contacted him in September 2004. Kinslow's civil rights suits were settled on August 27, 2004. Thus, Kinslow notes, the defendants began trying to transfer him very soon after the settlement. They accomplished his transfer less than two months later. He argues that this is "strong circumstantial evidence raising the clear presumption of a retaliatory intent." (Doc. 101 at 3.)[10]

To prove retaliatory motive, a prisoner may rely on circumstantial evidence of suspicious timing, as when the alleged retaliatory conduct follows quickly after the prisoner engages in a protected activity. *See Smith*, 899 F.2d at 949. Standing alone, however, such evidence is insufficient to create a fact issue. *See Wright v. McCotter*, No. 98-4095, 1999 WL 76904, at *1 (10th Cir. Feb. 18, 1999) (unpublished). And if the prison officials provide legitimate, nonretaliatory reasons for the transfer, the mere temporal connection may not justify an inference of causation. *Treff v. Dehaan*, No. 97-4016, 1997 WL 543373, at *2 (10th Cir. Sept. 3, 1997) (unpublished).

---

[10] Kinslow also asserts that, contrary to the instructions in the Order to File a *Martinez* Report, the NMCD Defendants have not produced all the documentation surrounding his transfer to New Mexico. He argues that this failure entitles him to an inference that the documentation would be favorable to him. (Doc. 101 at 5-6.) Kinslow does not state what documentation he thinks is missing. Therefore, he is not entitled to this inference.

Other than the circumstantial evidence of the timing of the transfer, Kinslow has presented no summary judgment evidence that the NMCD Defendants transferred him in retaliation for his filing the previous suits.  In asserting that the timing raises an inference of retaliation, Kinslow relies heavily on his contention that the NMCD Defendants were parties to the previous suits and the settlement. As demonstrated above, there is no evidence to support this contention.  Kinslow has not explained why the NMCD Defendants would desire to retaliate against him for something he did to the IDOC Defendants or why, given his litigious history, they would want to have him back in their care. Moreover, the NMCD Defendants have presented evidence of a legitimate nonretaliatory motive for transferring Kinslow—that it would be more economical to treat his condition in New Mexico.

Under these circumstances, the mere temporal connection between the settlement and the transfer is insufficient to create a genuine issue of material fact.  Accordingly, I recommend that summary judgment be granted in favor of the NMCD Defendants on Kinslow's claim that they conspired to retaliate against him by transferring him to New Mexico.

### USE OF DOG LEASH

Kinslow claims that correctional officers place him on a "dog leash" when he is not in his cell. He asserts that they do this to retaliate for the previous suits.  In support of this claim, he has filed an affidavit, stating, "[W]henever I was escorted from my segregation cell my hands would first be handcuffed behind my back, and a four (4) to six (6) foot leather leash would be attached to the handcuffs by a clip with the other end held by the Correctional Officer."  (Doc. 107 at 1.)  Kinslow contends that the leash is not needed to control him because he has not been a violent prisoner.  (*Id.*) He asserts that this treatment "is extremely humiliating and serves no legitimate penological purpose

that a reasonable person could see" and that the only reason for this treatment is to "debase and break the spirit of a human being." (*Id.* at 2.) Kinslow avers that because of this treatment, he suffers from severe and permanent emotional and psychological injuries, including depression, anxiety, insomnia, and thoughts of suicide. (*Id.*)

The *Martinez* report states that Kinslow "was never led around by a dog lease [sic]." (Doc. 95 at 6.) The report then describes the "control strap" that is used to escort Level VI inmates and states that the control strap is used "in accordance with Department policy and is an accepted way to control inmates during transportation." (*Id.*) The NMCD Defendants have submitted photographs of prisoners being escorted with a strap. (Doc. 98 Ex. 25, 26.) According to the *Martinez* report, the photos were taken from the NMCD's annual report. (Doc. 95 at 6.)

None of the information supplied by the NMCD Defendants can be used in deciding whether to grant summary judgment. The photos are unauthenticated. The statements in the *Martinez* report are unsworn and there is no indication that the attorney who wrote the report has personal knowledge regarding use of the control strap. The NMCD Defendants have not provided a copy of the purported "Department policy" authorizing use of the strap or any support for the conclusory assertion that this "is an accepted way to control inmates."

Nevertheless, summary judgment is appropriate as to this claim. Accepting Kinslow's description of the "dog leash" as accurate, use of this device simply does not rise to the level of a constitutional violation. As the Seventh Circuit stated in considering a similar claim: "[Plaintiff] does not object to the use of handcuffs but does not care one bit for the use of a waist belt and leg chains. This is the stuff of nickels and dimes." *Thielman v. Leean*, 282 F.3d 478, 484 (7th Cir. 2002); *see*

*also Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996) ("[Plaintiff] alleged that every time . . . guards moved him from his cell, they placed him in restraints that caused pain and cuts. However, for the protection of staff and other inmates, prison authorities may place a dangerous inmate in shackles and handcuffs when they move him from his cell.").

### DENIAL OF ACCESS TO THE COURTS

Kinslow asserts that all of the defendants withheld his legal files to prevent him from successfully challenging their violations of the settlement agreement in the Northern District of Illinois. He seeks summary judgment on this claim.[11]

To establish standing for this claim, Kinslow must show that the defendants' actions resulted in "actual injury." *See Lewis v. Casey*, 518 U.S. 343, 351-53 (1996). This does not mean that he "must prove a case within a case to show that the claim [that was] hindered or impeded . . . necessarily would have prevailed." *Simkins v. Bruce*, 406 F.3d 1239, 1244 (10th Cir. 2005). Actual injury occurs "not only when a claim is lost or rejected on account of the defendant's misconduct, but also when the plaintiff's efforts to pursue a claim are impeded." *Id.* Therefore, Kinslow must show that his claim was not frivolous and that the reason for its failure was logically related to the impediment created by the defendants. *See id.* The Tenth Circuit has noted that this standard applies

---

[11] In his motion for partial summary judgment, Kinslow makes two additional, related claims: 1) that the NMCD Defendants have denied him an adequate law library; and 2) that he wanted to appeal the denial of the motion to vacate, but, without his legal files, he could not research and draft an appeal before the time limit expired. Because these claims were not included in Kinslow's complaint they need not be considered. *See Liberty Lincoln-Mercury v. Ford Motor Co.*, 134 F.3d 557, 570 n.15 (3rd Cir. 1998); *Marten v. Yellow Freight Sys.*, 993 F. Supp. 822, 829 (D. Kan. 1998). In any event, Kinslow has not shown how the lack of an adequate law library hindered his efforts to have the settlement agreement vacated. Nor has he explained why he needed his legal materials to file a notice of appeal. All that had to be included in the notice of appeal was his name, a description of the order being appealed, and the name of the appellate court. *See* FED. R. APP. P. 3(c)(1).

only to the threshold question of standing and that "to prevail on a § 1983 right of access claim and substantiate more than nominal damages, a plaintiff may have to engage the merits of the underlying case." *Id.* at 1244 n.5.

Kinslow states in an affidavit that when he was transferred to New Mexico none of his legal files were transferred with him.  (Doc. 105 at 1.)  He claims that he contacted all of the defendants, including the NMCD Defendants, to seek their help in having the files transferred, but none of them intervened.  (*Id.* at 2.)  He wanted to file a motion to vacate the settlement agreement on the ground that his transfer to New Mexico violated the agreement, but he was unable to prepare a proper motion because he did not have his legal files.  (*Id.* at 1-2.)  As a result, the motion he did file was denied.  (*Id.* at 2.)  Although he received some of the files eight months after his transfer and after paying $104.21, three boxes of legal files and law books remain at the SCC.  (*Id.* at 2-3.)

I have already determined that the NMCD Defendants did not violate the settlement agreement for the simple reason that they were not parties to it.  Therefore, to the extent his motion to vacate was based on the NMCD Defendants' violations of the settlement agreement, the motion was frivolous.

Moreover, Kinslow speaks mostly in generalities about the need for his legal files and for copies of his "previous filings."   The transcript from the settlement conference is the only specific item that he identifies.  (*Id.* at 2.)  A copy of Kinslow's motion to vacate is on file with this Court. In that motion, Kinslow cited to a particular page in the transcript. (Doc. 80 Ex.  D.)  The judge who ruled on the motion obviously had access to the transcript because he quoted from it in denying the motion.  (*Id.* Ex. E.)  It also appears that the judge who ruled on the motion was the same judge who

presided over the settlement conference and would thus have been intimately familiar with the terms of the agreement.  (*Id.*)  For these reasons, Kinslow has not shown that the denial of his motion was logically related to his lack of the transcript or other legal materials.

I recommend that Kinslow's motion for partial summary judgment be denied as to this claim and that summary judgment be granted in favor of the NMCD Defendants.

CLASSIFICATION

As part of the conspiracy to retaliate against him for filing his civil rights suits, Kinslow alleges that upon his return to New Mexico the NMCD Defendants immediately placed him in administrative segregation and assigned him to a "Level VI" classification.  (Doc. 1 at 8.)  Kinslow claims that this violated his right to due process.  (*Id.* at 17.)  He also claims that he is being denied equal protection because every other New Mexico prisoner is afforded the right to progress through the classification system at regular intervals based upon good conduct.  (*Id.* at 11, 16-17.)  Kinslow has moved for summary judgment on these claims, and the NMCD Defendants have moved to dismiss or for summary judgment on the due process claim.

*Due Process*

In their one-paragraph motion to dismiss or for summary judgment, the NMCD Defendants first assert, "An inmate does not have a due process right to a particular classification . . . ."  (Doc. 95 at 13.)  This is an overstatement.  As will be explained below in connection with Kinslow's motion for summary judgment, classification decisions can implicate due process.  *See Trujillo*, 465 F.3d at 1225.  Next, the NMCD Defendants assert that inmates do not have a "'constitutional right to placement in a particular institution . . . .'" and that "[a]n inmate objecting to where they [sic] are

23

housed 'simply does not raise a federal constitutional claim.'" (Doc. 95 at 13 (citations omitted).) These assertions are irrelevant because Kinslow's due process claim is not based on his transfer to New Mexico, but on his restrictive classification and placement in administrative segregation. Accordingly, the NMCD Defendants' motion for summary judgment should be denied.

In an affidavit in support of his classification claims, Kinslow avers that during the nine-year-period preceding his transfer to New Mexico he was housed in the general population in Illinois and he committed no misbehavior that warrants his placement in administrative segregation. (Doc. 104 at 1.) When he was transferred to New Mexico, he was immediately placed in administrative segregation. (*Id.*) The only justification given for this placement was an alleged twenty-year-old escape for which he was never prosecuted. (*Id.* at 1-2.) Kinslow further avers that Unit Managers Rhoades and Griffith told him that the NMCD is not supposed to use escapes that occurred more than ten years ago to support placement in administrative segregation. (*Id.* at 2.) In another affidavit, he states that a unit manager told him that Sedillo, Bustos, and Garcia ordered that he be put into indefinite segregation, contrary to prison policy. (Doc. 103 at 3.)

According to the affidavit, for the first eighteen months after he was returned to New Mexico, Kinslow was kept in administrative segregation at the lowest, most restrictive classification of Level VI-Step Two without opportunity for advancement, contrary to how all other inmates are treated. (Doc. 104 at 2.) He was only allowed to begin advancing after he filed this suit. Even now he is only being advanced on paper without actually receiving any increase in privileges and he remains in administrative segregation. (*Id.* at 2-3.) Beginning in April 2006, he was finally allowed to appear regularly before the institutional classification committee, which recommended that he be released

to the general population.  (*Id.* at 2.)  But "[u]pon information and belief," Williams, Sedillo, LeMasters, Bustos, and Garcia have refused to make any final decisions on this recommendation, so he continues to be kept in administrative segregation.  (*Id.* at 2-3.)  In addition to these averments, Kinslow asserts for the first time in his unsworn motion for partial summary judgment that he is not eligible for parole because he is in administrative segregation.  (Doc. 101 at 10.)

Kinslow contends that he has a liberty interest in remaining in the general prison population because prison policies regarding classification are phrased in mandatory language, thereby creating an expectation that prisoners will not be segregated except under the circumstances described in the policies.  The Supreme Court has abandoned this approach to determining whether a liberty interest exists.  *See Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).

The correct way to determine whether administrative segregation implicates due process is to analyze whether it: 1) "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life;" or 2) inevitably increases the duration of the sentence imposed.  *Id.* at 484, 487; *see also Wilson v. Jones*, 430 F.3d 1113, 1120-21 (10th Cir. 2005).  Subsequent to *Sandin*, the Supreme Court held that the assignment of an inmate to a "supermax" prison implicated due process because it resulted in indefinite solitary confinement that was subject only to an annual review and because it disqualified an otherwise eligible inmate from parole consideration.  *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005).  The Court stated that although these conditions "standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship . . . ."  *Id.*

Kinslow claims that he has been in segregation for over two years and that this placement precludes his eligibility for parole.  Kinslow only recently began to assert that his placement in administrative segregation precludes his eligibility for parole.  This assertion is notably absent from his affidavit and he has not cited any legal authority for it.  Moreover, the record before me does not establish that Kinslow would be eligible for parole if he were not in administrative segregation.

It is undisputed, however, that Kinslow's segregation lasted at least twenty-seven months—from October 22, 2004 to January 23, 2007.  (Doc. 95 at 2, 4.)  Kinslow's affidavit, which I must accept as true for purposes of summary judgment, states that he is still in administrative segregation.  (Doc. 104 at 3.)  This amounts to over eight-hundred days in segregation.  In *Trujillo*, an inmate alleged he had spent over 750 days in segregation.  The Tenth Circuit stated, "Where, as here, the prisoner is subjected to a lengthy period of segregation, the duration of that confinement may itself be atypical and significant."  *Trujillo*, 465 F.3d at 1225.  I will therefore assume for purposes of argument that Kinslow has a liberty interest in not being segregated.[12]

Assuming the existence of a liberty interest, the remaining question is whether Kinslow has received all the process to which he is due.  Although Kinslow focuses on the NMCD Defendants' alleged failure to follow prison policies, this failure is insufficient to establish a violation of due process.  *See Lusero v. Welt*, No. 06-1395, 2005 WL 5302913 at *3 (10th Cir. March 27, 2007)

---

[12] The Supreme Court has emphasized that to determine whether a prisoner experiences an atypical and significant hardship, it is necessary to compare the prisoner with other inmates.  *See Sandin*, 515 U.S. at 486; *see also Trujillo*, 465 F.3d at 1225.  For this reason, in the Order to File a *Martinez* Report, I instructed the NMCD Defendants to compare "the duration of Kinslow's confinement in administrative segregation with that of other prisoners who have been in administrative segregation."  (Doc. 81 at 4.)  Contrary to this instruction, the *Martinez* report failed to address this issue.

26

(unpublished) (quoting *Brown v. Rios*, No. 06-1210, 2006 WL 2666058, at *2 (10th Cir. Sept. 18, 2006) (unpublished)); *see also Hulen v. Yates*, 322 F.3d 1229, 1247 (10th Cir. 2003) ("[O]nce the . . . right is established, it is purely a matter of federal constitutional law whether the procedure afforded was adequate.").

In *Wilkinson*, the Supreme Court held that informal, nonadversary procedures are adequate when a classification decision is based on the safety of other inmates and prison personnel and when the issues draw on the experience of prison administrators.  545 U.S. at 228-29.  The prisoner is entitled to notice of the charges against him, an opportunity to present his views in writing, and a review of the charges and the evidence by a factfinder.  *Hewitt v. Helms*, 459 U.S. 460, 476 (1983), *abrogated in part on other grounds by Sandin*, 515 U.S. at 479-84.  Even when formal procedures are required, due process is satisfied when: 1) the prisoner is given advance written notice and an opportunity to call witnesses and present documentary evidence; 2) the factfinder provides a written statement of the evidence relied upon on and the reasons for the action; and 3) the decision is supported by some evidence.  *Wilson*, 430 F.3d at 1117.

Kinslow does not complain of a lack of notice, refusal to allow him to present evidence, or failure of the factfinder to provide a written statement of evidence and reasons.  In responding to Magistrate Judge Schneider's show cause order, Kinslow submitted a copy of his written appeal of his initial placement in Level VI as well as Bustos's written denial of another appeal.  (Doc. 12.)  The denial states that Kinslow's placement was based on behavior that threatened the security of the institution, specifically, his history of successfully escaping on two occasions and his having been found with wire cutters on another occasion.  Bustos considered and rejected Kinslow's claim that

27

prison policies prohibit the consideration of an escape that occurred more than ten years ago and his argument that the escape should not be considered because he was never convicted of escape. (*Id.*) Thus, Kinslow's own submissions to this Court demonstrate that he was given an opportunity to argue his case before the factfinder and that the factfinder cited evidence and reasons to support the classification decision.

Kinslow asserts that the NMCD Defendants have failed to present any evidence that his recent behavior justifies his segregation or that he is a threat to the security of the institution. But he does not directly deny that he escaped in the past. Prison authorities could certainly conclude that an inmate with a history of escaping is a threat to the institution. *See Sandin*, 515 U.S. at 482 (indicating that courts should afford deference to the decisions of prison officials).

I conclude that Kinslow was provided all the process to which he was due when he was initially classified and placed in administrative segregation. Therefore, summary judgment should be granted in the NMCD Defendants' favor to the extent that Kinslow complains of a lack of due process in the initial classification decision.[13]

In addition to complaining about his initial classification and placement in administrative segregation, Kinslow complains that his segregation has lasted for over two years without meaningful review. He contends that he has effectively been placed in segregation indefinitely.

---

[13] Kinslow also asserts that he was placed in administrative segregation immediately after the escape occurred and that using it as a basis for a second round of administrative segregation is "double punishment" in violation of due process. (Doc. 101 at 10.) If Kinslow is attempting to raise a double jeopardy objection to his administrative segregation, that objection is without merit. *See Fogle v. Pierson*, 435 F.3d 1252, 1261-62 (10th Cir.), *cert. denied*, 127 S. Ct. 675 (2006).

The Supreme Court has cautioned that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate [and that] [p]rison officials must engage in some sort of periodic review of the confinement of such inmates." *Hewitt*, 459 U.S. at 477 n.9; *see also United States v. Johnson*, 223 F.3d 665, 673 (7th Cir. 2000) (Posner, J.) ("The Bureau of Prisons could not . . . commit a prisoner to the control unit for life, refusing to consider circumstances that might render his joining the open population of the prison harmless . . . .").

The *Martinez* report states that when Kinslow first returned to New Mexico in October 2004, he was classified at Level VI because he was determined to be a security threat due to his previous escapes.  (Doc. 95 at 3-4.)  On November 7, 2004, he was placed in voluntary segregation, at his request.  The *Martinez* report states that Kinslow "asked to be taken out of voluntary segregation, which he was.  He was then returned to involuntary segregation." (*Id.* at 4.)  The report does not say when this change occurred.  The report asserts that Kinslow was kept in administrative segregation until January 23, 2007, but that he is currently in the general population at Level IV.  (*Id.*)  The *Martinez* report further states that Kinslow's classification has been reviewed each year "per [some unidentified] policy," that on April 10, 2006, the classification committee recommended that his classification be changed from Level VI to Level IV, and that this recommendation has been reviewed and approved by the Deputy Director of Prisons.  (*Id.* at 5.)  Like the other assertions in the *Martinez* report, these assertions are not sworn and there is nothing in the report to indicate that the attorney who prepared it has personal knowledge of Kinslow's status.  The exhibits cited in support of these assertions are, like the other exhibits, unauthenticated.  They are also difficult to understand.

From reviewing the exhibits, it appears that Kinslow's voluntary segregation only lasted a few days. (Doc. 98 Ex. 13, 21.) One of the exhibits is a "Level VI Status Review – 7 and 30 Days" form, dated September 28, 2005. (*Id.* Ex. 21.) The box for "30 day" review is checked. The form indicates that Kinslow was in involuntary segregation because he was a security threat due to his safety being threatened—not because of his escape history. The form states that the next review will be on October 26, 2005. (*Id.*) I cannot find any documentation that a review occurred in October 2005, but there is documentation of an April 2006 review.

The top portion of a "UMT Review for Release from Level V or VI" form contains an April 2006 recommendation by the unit manager that Kinslow be released to Level IV. That same month, another official recommended on another form that he progress through Level V before being released to the general population at Level IV. (*Id.* Ex. 22.) On the middle section of the same UMT form that was signed by the unit manager, the warden recommended Kinslow's release from Level VI to Level V on January 22, 2007. (*Id.* Ex. 45.) There is no explanation for the nine-month delay. On the bottom section of the form, another official wrote "Would have completed L V & is now therefore eligible for L IV." This notation is signed by either the deputy director of adult prisons or the classification bureau chief and is dated January 23, 2007. (*Id.*)

In a September 7, 2006 response to Kinslow's motion for sanctions, the NMCD Defendants' previous counsel asserted that Kinslow was in Level V. (Doc. 57.) This is inconsistent with the warden's recommendation that he be released to Level V four months later. The motion for sanctions was based on the NMCD Defendants' representation to the Court that Kinslow was in the general population. (Doc. 54.) In their response to the motion for sanctions, the NMCD Defendants

30

admitted that he was not in the general population and explained that the misrepresentation was based on inaccurate information in the NMCD's criminal information management system. (Doc. 57.)

In short, although the *Martinez* report states that Kinslow's classification has been regularly reviewed and that he is currently in the general population at Level IV, the exhibits before me do not confirm these assertions. Kinslow, meanwhile, continues to aver that he is in administrative segregation. The unexplained delay in approving the recommendation to change his classification arguably raises an inference of an improper motive. Therefore, summary judgment should not be granted on Kinslow's claims that his classification has not been regularly reviewed and that he is being kept in administrative segregation for retaliatory reasons.

*Equal Protection*

Kinslow's equal protection claim centers on his contention that every other New Mexico prisoner is afforded the right to progress through the classification system at regular intervals based upon good conduct. He does not allege that he is being treated differently because of any suspect classification. Therefore, to prevail on his equal protection claim, he must prove that the distinction between himself and other New Mexico prisoners is not reasonably related to a legitimate penological purpose. *Trujillo*, 465 F.3d at 1228. This is a heavy burden. *Id.*

Although Kinslow conclusorily asserts that there is no legitimate penological justification for his treatment, the parties agree that his history of escape is the stated reason for Kinslow's classification and placement in administrative segregation. Maintaining the security of the prison is a legitimate penological goal. Kinslow has failed to establish that segregating a prisoner with a

history of escaping is not reasonably related to this goal.  *See Fogle*, 435 F.3d at 1260-61.  Therefore, summary judgment should be granted in the NMCD Defendants' favor on the equal protection claim.

## MEDICAL CLAIMS

Kinslow claims that the NMCD Defendants have been deliberately indifferent to his serious medical needs in two ways: 1) interrupting his Hepatitis C treatment by transferring him to New Mexico; and 2) refusing to perform the tests recommended by Dr. Coltran, his Illinois consulting physician.

Deliberate indifference has both objective and subjective components.   The objective component concerns whether the harm suffered is sufficiently serious; the subjective component concerns whether the defendants knew of and disregarded an excessive risk to the inmate's health or safety.  *Kikumura v. Osagie*, 461 F.3d 1269, 1291 (10th Cir. 2006).

In an affidavit in support of his deliberate indifference claims, Kinslow states that he started on a one-year course of Hepatitis C treatment in May 2004, requiring that he take a combination of two medicines.  (Doc. 106 at 1-2.)  He was transferred to New Mexico in October 2004 without arrangements to ensure that his medication would be properly administered during the six-day trip.  (*Id.* at 3-4.)  According to Kinslow, although he had been responding well to the treatment before his transfer, the treatment failed after the transfer because of the interruption.  He asserts that his liver condition continues to deteriorate and the disease has a high probability of causing his death.  (*Id.* at 6.)[14]

---

[14] In the affidavit, Kinslow asserts that because his medicine was not properly stored or administered in route, he suffered from various immediate and severe, but apparently temporary, side effects.  (Doc. 106 at 5.)  In his complaint he only seeks to recover for the alleged long-term effects of the interruption in treatment.

Kinslow also asserts that Dr. Coltran recommended several tests, including a biopsy of a polyp, because Kinslow was experiencing "serious and painful intestinal problems." (*Id.*) The NMCD Defendants are refusing to authorize or perform the tests, even though he continues to suffer from the same intestinal symptoms. For approximately two years, he has experienced "almost daily painful diarrhea, intestinal inflammation and swelling, sharp shooting pains in [his] left side, and periodic rectal bleeding." (*Id.* at 7.)

In the Order to File a *Martinez* Report, I instructed the NMCD Defendants to respond to Kinslow's medical claims, "including records of Kinslow's medical treatment or tests after his return to New Mexico from Illinois in 2004 and any SCC medical records related to Kinslow's liver disease that are in the possession of the NMCD Defendants." (Doc. 81 at 5.) After being granted several extensions of time to file the *Martinez* report, the NMCD Defendants sought clarification of this instruction. (*See* Doc. 92, 94, 97.) Stating that there were over 1200 pages of medical records, the NMCD Defendants' counsel asked whether he should file all of the records. I advised counsel that he need not file all of the records, but should review them to determine which ones are relevant to Kinslow's specific claims and are responsive to the instructions in the Order to File a *Martinez* Report. (Doc. 99.) I also stated, "If the SCC records regarding Kinslow's liver disease are voluminous, counsel may omit the records that are not relevant to Kinslow's specific claim regarding tests recommended by the consulting physician." (*Id.*) Kinslow then filed a motion to compel production of the entire 1200 pages of medical records, and I took this motion under advisement. (Doc. 109, 113.) The NMCD Defendants filed selected medical records over six weeks after the issuance of my order advising which ones had to be produced. (Doc. 115.) Like all of the exhibits

to the *Martinez* report, the records are unauthenticated.  No medical records from SCC were submitted.

The unsworn pleading accompanying the medical records does not address Kinslow's claim that the NMCD Defendants are refusing to perform the tests recommended by Dr. Coltran.  It states that Kinslow's treatment for Hepatitis C resumed soon after he arrived in New Mexico and that by March 2005, his HCV levels "dropped to the point of being 'undetectable' . . . ."  (Doc. 115.) Counsel does not cite to any of the medical records for the quoted word "undetectable," and I have not found that word in the records.  Counsel furthers states that in September 2005, six months after Kinslow's treatment ended, his HCV levels were detectable again, but "that does not mean that they reached a detectable level because of his transfer." (*Id.*)  Counsel then notes that a University of New Mexico specialist in Hepatitis C oversaw Kinslow's treatment.  Counsel could not obtain an affidavit from the specialist because he was out of the country until April 7, 2007.  Counsel concludes by stating, "It is counsel's belief that [the specialist] would not agree with Plaintiff's claims." (*Id.*)  Over six weeks have passed since the specialist was scheduled to be back in the country, but counsel has not attempted to supplement the record with an affidavit.

The NMCD Defendants have made no attempt to decipher the medical records they have submitted, many of which are illegible.  Some of the records contain an entry for "HCV RNA QUANT."  Records from November 19, 2004 and March 28, 2005 show a result of "<50," where the reference range is "LESS THAN 50," and a result of "<1.70," where the reference range is "LESS THAN 1.7." (Doc. 115 Ex. E7, E12.)  A record from September 30, 2005 shows results of 27900000 and 7.45 for the respective reference ranges.  (*Id.* Ex. E5.)

34

In reply, Kinslow asserts that the success of Hepatitis C treatment can be determined by measuring the AST/ALT levels in the patient's blood.  Elevated AST/ALT levels indicate that the Hepatitis C virus is destroying healthy liver cells.  (Doc. 119 at 2.)  Kinslow has submitted several unauthenticated medical records from SCC, which seem to show that he had normal AST/ALT levels before his transfer to Illinois.  (Doc. 108 Ex. 2-4.)  Although not mentioned by Kinslow, these records also seem to show high HCV levels that decreased over time.  Kinslow points out that some of the medical records submitted by the NMCD Defendants show elevated AST/ALT levels after he was transferred to New Mexico.  (*See* Doc. 115 Ex. E1-E3, E7, E9, E11A, E12, E14.)

I will first consider Kinslow's claim regarding the interruption in his Hepatitis C treatment. To determine whether this claim satisfies the objective component of deliberate indifference, I must look to the injury alleged by Kinslow and determine whether that harm is sufficiently serious.  *See Kikumura*, 461 F.3d at 1292.  When a prisoner complains about an interruption in medical treatment, the focus is on whether the interruption caused the prisoner substantial harm.  *See Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003); *see also Erickson v. Pardus*, 198 F. App'x 694, 697-98 (10th Cir. 2006) (citing *Smith*, 316 F.3d at 185). The subjective component is satisfied if  the defendants were aware of facts from which the inference of a substantial risk of serious harm could be drawn and they actually drew that inference.  *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir.), *cert. denied*, 127 S. Ct. 131 (2006).  The fact that a serious medical need was obvious may be evidence of deliberate indifference.  *Id.*

If the interruption in treatment caused the treatment to fail, this would presumably constitute substantial harm to satisfy the objective component of a deliberate indifference claim.  It may also

have been sufficiently obvious to satisfy the subjective component. However, the record is not sufficiently developed on this issue. All I have before me are the raw medical records and the parties' conflicting arguments about whether the records show a deterioration in Kinslow's condition as a result of the interruption in treatment. Therefore, this claim is not ripe for summary judgment.[15]

Kinslow's claim regarding the failure to perform the tests recommended by Dr. Coltran is also not ripe for summary judgment. Kinslow avers that he has suffered severe pain for two years and he alleges that the tests were recommended to screen him for colo-rectal cancer and Crohn's disease. The narrative portion of the *Martinez* report ignores this claim. Although the medical records contain some references to treatment for diarrhea, there is no indication in the record as to why the tests recommended by Dr. Coltran have not been performed.

Ordinarily, deciding whether to order tests is a matter for medical judgment and the failure to order tests is not cruel and unusual punishment. *Estelle v. Gamble*, 429 US. 97, 107 (1976); *El'Amin v. Pearce*, 750 F.2d 829, 832-33 (10th Cir. 1984). Moreover, the failure of one doctor to follow the advice of another doctor does not constitute deliberate indifference. *Stewart v. Murphy*, 174 F.3d 530, 535 (5th Cir. 1999). On the other hand, a deliberate indifference claim can lie where prison officials deliberately ignore the recommendations of an inmate's physician. *Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005). In this case, I cannot determine from the records before me whether the failure to perform the tests was based on medical judgment, negligence, or deliberate indifference.

---

[15] I also note that the parties have not separately addressed the potential culpability of the various NMCD Defendants. *See Mitchell v. Maynard*, 80 F.3d 1433, 1441, 1444 (10th Cir. 1996).

## MOTIONS TO COMPEL

As noted above, Kinslow filed a motion to compel the NMCD Defendants to produce all of his medical records within their control. (Doc. 109.) He asserts that he needs the records to avoid summary judgment on his medical claims. I have not recommended that summary judgment be granted on the medical claims at this point. Moreover, it is apparent that Kinslow already has some of the records, such as the SCC records, that were not produced by the NMCD Defendants. Because Kinslow managed to avoid summary judgment without the additional medical records, I recommend that this motion to compel be denied.

Kinslow has filed another motion to compel, in which he asserts that the NMCD Defendants did not serve him with Documents 110, 111, and 112. (Doc. 114.) He requests that they be ordered to serve these documents on him and that he be granted an extension of time to respond to them. Documents 111 and 112 are motions for extension of time, which were granted before Kinslow filed his motion to compel. (Doc. 113.) Both of these documents have proper certificates of service. Document 110 is the NMCD Defendants' response to Kinslow's motion for partial summary judgment. This document, which also has a proper certificate of service, contains no substantive arguments. It merely recites the standard of review and asserts that summary judgment should not be granted because there are disputed material fact issues. I have not relied on this document in making any of my recommendations. Accordingly, I recommend that this motion to compel be denied.

## CONCLUSION

For the reasons stated above, I recommend that:

1)      all of Kinslow's claims for retroactive monetary relief against the NMCD Defendants in their official capacities be dismissed with prejudice;

2)      Kinslow's motion for partial summary judgment (Doc. 101) be denied;

3)      the NMCD Defendants' motion to dismiss or for summary judgment (included within the *Martinez* report) be denied;

4)      Kinslow's motions to compel (Docs. 109, 114) be denied; and

5)      summary judgment be granted in favor of the NMCD Defendants on the federal claims asserted in the first, second, third, fourth, and sixth counts of Kinslow's complaint and on the fifth count to the extent it raises a claim of lack of due process in the initial classification decision.

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636 (b)(1). **A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

---

WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.