# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JIMMY KINSLOW,

                Plaintiff,

      v.                                 CV 05-1324 JH/WPL

JOE WILLIAMS, ET AL.,

                Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

This matter is before me on a *Martinez* report submitted by the NMCD Defendants and several motions filed by Plaintiff Kinslow. The parties were notified that the *Martinez* report might be used in deciding whether to grant summary judgment *sua sponte* and that they should submit whatever materials they considered relevant to Kinslow's claims.

### SUMMARY JUDGMENT STANDARDS

Summary judgment should be granted when the record demonstrates "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The record and all reasonable inferences therefrom must be viewed in the light most favorable to the nonmovant. *See Muñoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000). A court cannot resolve material disputed factual issues by accepting a *Martinez* report's factual findings when they are in conflict with pleadings or affidavits. *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). Likewise, summary judgment may not be predicated on statements in a *Martinez* report that are not sworn or not based on personal knowledge. *See Hayes v. Marriott*, 70 F.3d 1144, 1147-48 (10th Cir. 1995).

CLASSIFICATION CLAIMS

**Procedural Background**

Kinslow's complaint alleges that the NMCD Defendants placed him in administrative segregation and assigned him to a Level VI classification in retaliation for his filing prior civil rights suits. (Doc. 1 at 8.)  The purported justifications for this classification and placement were a years-old escape and possession of tools that could be used to escape.  (*Id.* at 9.)  Kinslow was placed in administrative segregation at Level VI upon his return to New Mexico from Illinois in October 2004 and, according to the complaint, was still in administrative segregation when this suit was instituted in December 2005.  (*Id.* at 1, 7-9.)  The complaint alleges that Kinslow was periodically given a form to sign, stating that he remained at Level VI, Step 2.   His classification and placement in administrative segregation were not otherwise reviewed and he was not allowed to advance to a better classification despite his good conduct.  (*Id.* at 10.)

I ordered the NMCD Defendants to respond to these allegations in a *Martinez* report and allowed Kinslow an opportunity to respond to the *Martinez* report.  (Doc. 81 at 4.)  Based on the parties' submissions, it was undisputed that the stated reason for Kinslow's initial classification at Level VI and placement in administrative segregation was that he was deemed to be a security threat due to his escape history.   (Doc. 122 at 28.)   Based on the length of time Kinslow spent in administrative segregation, I assumed that Kinslow had a liberty interest in not being segregated.  (*Id.* at 26.)  I concluded, however, that Kinslow was given all the process to which he was due in the initial classification decision and that the decision was supported by adequate evidence, *i.e.*, his escape history.  (*Id.* at 26-28.)  I therefore recommended that summary judgment be granted in favor of the NMCD Defendants "to the extent that Kinslow complains of a lack of due process in the initial

classification decision." (*Id.* at 28.)  However, because of inconsistencies in the NMCD Defendants'

submissions and the inadequacies of their *Martinez* report, I could not recommend that summary

judgment be granted on Kinslow's claim that his classification and placement in administrative

segregation were not meaningfully reviewed.  (*Id.* at 31.)

After the presiding judge adopted my recommendations, I ordered the NMCD Defendants to

file a motion for summary judgment on the remaining claims.  (Doc. 124, 130.)  They failed to do so.

I then ordered them to submit a second *Martinez* report to address

> Plaintiff's claims that he was kept in administrative segregation for over two years without meaningful review and that he has been placed in administrative segregation indefinitely and for retaliatory reasons, including
>
> A)    a statement, supported by proof, of Plaintiff's current classification and of whether he is currently in administrative segregation;
>
> B)    an explanation of why he was kept in administrative segregation for over two years;
>
> C)    copies of all documents regarding Plaintiff's detention in administrative segregation after his return to New Mexico from Illinois in 2004;
>
> D)    a description of the conditions and restrictions imposed upon Plaintiff while in administrative segregation as compared with other prisoners in administrative segregation and prisoners outside of administrative segregation; and
>
> E)    a comparison of the duration of Kinslow's confinement in administrative segregation with that of other prisoners who have been in administrative segregation; . . . .

(Doc. 167 at 5.)

## The Martinez Report and Response

The *Martinez* report filed in response to this order states that Kinslow is currently classified as a Level IV prisoner and is in the general population.  In reference to item B in the order, the narrative portion of the report cites the escape history and Kinslow's request for protective custody. (Doc. 170 at 3-4.)

Regarding item E, the report states, "In attempting to compare Inmate Kinslow to others similarly situated, Counsel was unable to obtain information to compare his progress to other inmates, as the various items that could affect an inmates [sic] progress could be affected by any disciplines that were imposed, the severity of such discipline and thus regression within the Steps."  (*Id.*)  The narrative portion of the report does not address item D.  A policy attached to the report describes the conditions of imprisonment at Levels V and VI, but does not provide comparable details for the other classification levels.[1]  The policy states that Level V and VI inmates have the opportunity for one hour of recreation five times per week.  (*Id.* Ex. 3L at 2.)  Inmates in Steps 1 through 3 are restrained before leaving their cells and undergo an unclothed body search before and after recreation.  (*Id.*) Level V and VI inmates may possess certain religious items and books and may receive visits from religious leaders or volunteers, but decisions regarding the visits are made on an individual basis.  (*Id.* at 3.)  They can check out general library books once a week through a book cart or checkout list. (*Id.*)  Level V and VI inmates generally receive face-to-face, noncontact visits.  (*Id.* at 4.)  They have access to educational programming on television.  (*Id.* at 5.)

---

[1] Exhibit 15 to the first *Martinez* report contains a cursory description of the other levels as of May 2006.  Regarding Level III, it states that inmates have "the ability to function among other inmates in general population."  And regarding Level IV, it states that inmates have "the ability to function in general population," but "[i]nmate movement is limited to small groups (up to 16 inmates) and inmates are placed under escort during any movement or group activity."  (Doc. 98 Ex. 15 at 2.)

In addition to the policy regarding conditions of confinement, the *Martinez* report also contains copies of other policies governing classification at Levels V and VI. (*Id.* Ex. 3J, 3K.) The policies refer to five steps that make up Levels V and VI, with Step 1 being the most restrictive and Step 5 the least. (*Id.* Ex. 3K at 3.) An inmate who has been classified at Level V or VI must spend a minimum number of consecutive days in each step. Thus, at a minimum, it takes a total of 187 days to complete the first three steps and a total of 180 days to complete the fourth and fifth steps. (*Id.*)

The policies require a status review of a Level VI classification every seven days for the first two months following the initial Level VI classification committee hearing and at least every thirty days thereafter. (*Id.* at 6.) Additionally, a unit management team must review the inmate's status five days before each scheduled increase from Steps 2 through 5. (*Id.* at 13, Ex. 3K at 3.) The unit management team must also review a Level VI classification annually. Unlike the status reviews conducted every seven or thirty days, this review requires a hearing with an opportunity to appeal. (*Id.* Ex. 3J at 20.)

The *Martinez* report includes an affidavit by a records manager, stating that Kinslow progressed through the steps program, "ultimately reaching the ability to be placed in Level V," but that "[a] final decision was made to have Kinslow placed in Level IV, by-passing the Level V program." (*Id.* Ex. 1 at 2.) The affidavit describes Level IV as "a special control general population setting." (*Id.* at 3.) Attached to the affidavit are documents regarding Kinslow's classification and placement in administrative segregation.[2]

---

[2] One of the documents attached to the affidavit is a printout from the criminal management information system (CMIS), which shows that Kinslow was placed in Level VI, Step 1 on October 27, 2004; progressed to Level VI, Step 2 on November 7, 2004; progressed to Level VI, Step 3 on September 1, 2005; progressed to Level VI, Step 4 on January 5, 2006; progressed to Level VI, Step 5 on May 26, 2006; progressed to Level V, Step 1 on August 8, 2006; and progressed to Level IV on January 23, 2007. (*Id.* Ex.

The attachments to the affidavit include some of the documents provided in the first *Martinez* report, along with additional documents.   The documentation shows that when Kinslow was transferred back to New Mexico in October 2004, he was incarcerated at the Penitentiary of New Mexico (PNM).   (*Id.* Ex. 1E.)   Like the first *Martinez* report, the documentation attached to this *Martinez* report indicates that he was initially placed at Level VI based on his escape history, he appealed this placement, and it was affirmed by the Director of Adult Prisons on November 17, 2004. (*Id.* Ex. 1A, 1B.)   On November 4, 2004, Kinslow was transferred from PNM to the Southern New Mexico Correctional Facility (SNMCF).   (*Id.* Ex. 1E.)   On November 7, 2004, while his Level VI appeal was pending, he requested to be placed in voluntary protective custody because of "recurring problems with SNM gang members due to the nature of my crimes" and because he had previously been attacked by an inmate.   (*Id.* Ex. 1C.)

Kinslow's case was referred for a classification hearing on November 16, 2004.   A "Level V/VI Hearing Decision" form dated November 16, 2004, indicates that the reason for Kinslow's initial placement in Level VI was "Voluntary Inmate Protection."   Under the heading "Summary of Evidence," the form states that Kinslow was placed in Level VI due to his escape history and that he was deemed to be a threat to the security of the institution.   Under the heading "Decision," the words "Remain Level VI due to being threat to security" appear.   (*Id.*)

---

1E.)  I place no reliance on the CMIS printout for several reasons.  First, it shows that Kinslow was in Level V, Step 1 from August 2006 to January 2007, but that is inconsistent with the records manager's affidavit, which states that he bypassed Level V.  Second, it shows that Kinslow progressed to Step 3 on September 1, 2005, but that is inconsistent with a September 28, 2005 form that describes Kinslow as a Level VI, Step 2 inmate.  Third, my earlier PFRD indicates that the CMIS is not reliable.  (Doc. 122 at 30-31.)

6

From November 2004 to early June 2005, forms entitled "Level VI Status Review — 7 and 30 Days" were completed weekly.  (*Id.* Ex. 1D.)[3]  Thereafter, the forms were completed monthly until September 28, 2005.  The forms vary in the reasons given for Kinsow's initial placement in Level VI, with some of the forms referring to his request for protection and others referring to his being a threat to the security of the institution.  Some of the forms also note that Kinslow was at SNMCF for medical treatment and would be sent back out of state once that treatment was completed.

After the September 2005 form, the next document in the *Martinez* report is a "UMT Review for Release from Level V or VI or Consideration for Level V Progression to Step 4" form, dated April 10, 2006.  It indicates that the unit management team recommended Kinslow's release from Level VI.  The basis for the recommendation was that he had "been programming well as the Pod Porter with outstanding results."   There were no negative remarks on his behavior logs and he maintained a positive attitude with staff.  The remarks include this recommendation: "Refer to Level IV w/mandatory override at Level IV."   A form documenting the security threat group investigation, dated the following day, states that Kinslow had no security threat group affiliation, but that there were concerns about his escape history and the fact that he was serving multiple life sentences.  Accordingly, "STIU" recommended that he progress through Level V before proceeding to Level IV. The section of the UMT form for the warden's review states that release from Level VI to Level V was approved.  This section of the form was signed on January 22, 2007.[4]

---

[3] All of the remaining documents that I will discuss regarding Kinslow's classification are included within Exhibit 1D of the *Martinez* report without page numbers.

[4] The bottom section of this form is for "Central Office Review and Determination."  This section is blank in the copy attached to the second *Martinez* report.  On a copy of the form that was included in the first

The next document in the *Martinez* report is a "Step Progression Review" form, which was signed by the classification officer on May 26, 2006 and by the unit officer on May 31, 2006.  This form is difficult to interpret, but it seems to reflect that Kinslow was approved for advancement to Step 3 on January 5, 2006.  The form states that Kinslow had 337 consecutive days of clear conduct, and under "Justification," the form states, "Inmate Kinslow has been a model Inmate.  Was assigned as Pod Porter on 9/30/05 and has worked well with Staff.  No disruptive behavior.  Maintains Pod in immaculate shape."

The next document is a "UMT Review for Release from Level V or VI or Consideration for Level V Progression to Step 4" form, dated May 26, 2006.  It indicates that completion of Level VI, Step 3 was approved by the unit management team.  The basis for this recommendation was that as of January 5, 2006, Kinslow had maintained good behavior and programmed well.  As pod porter, he maintained the best looking pod at the facility.  The section on the form for the warden's review indicates that Kinslow's advancement to Step 4 was approved.  However, the warden's signature is missing.

The last form is a Step Progression Review, which indicates that Kinslow's advancement to Step 5 was effective on May 26, 2006.  The form states that Kinslow had 506 consecutive days of clear conduct and the justification for advancement was that Kinslow was a "model inmate" who kept to his business, worked hard, and had no problems with staff or other inmates.

---

*Martinez* report, the bottom section states, "Would have completed LV & is now therefore eligible for LIV." It was signed on January 23, 2007.  (Doc. 98 Ex. 45.)

In response to the *Martinez* report, Kinslow concedes that he is currently classified at Level IV, but disputes that there is any meaningful distinction between the conditions of his confinement now and when he was classified at Level VI.

## Legal Analysis

To establish that his right to due process was violated, Kinslow must show that (1) he was deprived of a liberty interest, (2) without adequate procedural protections. *See Estate of DiMarco v. Wyo. Dep't of Corr.*, 473 F.3d 1334, 1339, 1344 (10th Cir. 2007).

### *Liberty Interest*

"[A] protected liberty interest may arise from prison placement decisions and conditions of confinement." *Id.* at 1340. But such an interest is "generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

To determine whether prison conditions constitute an atypical and significant hardship in relation to the ordinary incidents of prison life, the Tenth Circuit has held that a court must have sufficient evidence before it to address both the duration and the degree of the plaintiff's restrictions as compared with other inmates. *Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006). The court stated that when a "prisoner is subjected to a lengthy period of segregation, the duration of that confinement may itself be atypical and significant." *Id.* The court subsequently held that to determine whether a prisoner has a liberty interest in avoiding administrative segregation, "[r]elevant factors might include whether (1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement . . .; and (4) the placement is indeterminate . . . ." *DiMarco*,

9

473 F.3d at 1342.  The court indicated that none of these factors is dispositive.  *Id.*  Although the court in *DiMarco* did not treat the length of segregation as a separate factor that may in itself be atypical and significant, I assume that the length of segregation continues to be a relevant factor in the analysis.  *See, e.g., Payne v. Friel*, 266 F. App'x 724, 728 (10th Cir. 2008) (reversing dismissal of claim, after *DiMarco*, because trial court did not inquire into whether the duration of segregation alone constituted an atypical and significant hardship), *cert. denied*, 2008 WL 2076656 (Oct. 6, 2008).

Kinslow was in administrative segregation from October 22, 2004 to January 23, 2007—a period of approximately two years and three months.  The NMCD Defendants refused to provide information comparing the length of Kinslow's segregation with that of other inmates.  The policies they submitted indicate that once a prisoner is placed in administrative segregation, it takes a minimum of approximately one year to progress out of segregation.  In response to the *Martinez* report, Kinslow states that it takes 374 days for a prisoner who obeys the rules to progress through all of the steps and be released to the general population.  (Doc. 178 at 6.)  Because the NMCD Defendants refused to provide any comparative information, I will assume that 374 days is the normal period of segregation.  Kinslow was segregated for almost one year and three months longer than this period.

Turning to *DiMarco*'s first factor, Kinslow was segregated because of his history of escaping.  It almost goes without saying that this is a legitimate penological justification.  *See Peoples v. CCA*

*Det. Ctrs.*, 422 F.3d 1090, 1106 (10th Cir. 2005) (holding that a substantiated escape threat was a a legitimate rationale for segregation), *vacated in part*, 449 F.3d 1097 (10th Cir. 2006).[5]

In contemplating the length of Kinslow's segregation, it is important to note the seriousness of his escape history. In 1978, while he was serving his sentence in Wyoming, he escaped to Georgia and committed a crime there. (Doc. 170 Ex. 1A.) In 1987, Kinslow and other inmates escaped from PNM, went to Arizona, kidnaped a family, took it to California, and sexually assaulted some of the family members. (*Id.*) In 1994, he was found in possession of wire cutters at PNM. (*Id.*) Prison officials would be justified in being especially concerned about Kinslow escaping again.[6]

The second factor mentioned in *DiMarco* is whether the conditions of segregation are extreme. Here again, the NMCD Defendants have failed to provide information comparing Kinslow's conditions with other inmates, despite being ordered to provide this information on two occasions. (*See* Docs. 81, 167.) Accordingly, I accept as true Kinslow's description of his conditions in Level

---

[5] Kinslow was also segregated for his own protection for some part of the time. It is unclear how long his voluntary segregation lasted. Kinslow claims, "As soon as he learned that he was classified as 'voluntary' administrative segregation he made his Unit Manager to correct [sic] it to 'involuntary.'" (Doc. 178 at 5.) This assertion is supported by the narrative portion of the first *Martinez* report, which states that Kinslow "asked to be taken out of voluntary segregation, which he was. He was then returned to involuntary segregation." (Doc. 95 at 4.) Unfortunately, neither Kinslow nor the NMCD Defendants state exactly when this change occurred. The narrative portion of the second *Martinez* report asserts that Kinslow's "voluntary placement was converted to Involuntary placement almost eight months later when he was unable to specifically identify individuals who would or could cause him harm; just a general fear of some unknown character based on gang members also in the prison." (Doc. 170 at 4.) The NMCD Defendants have provided no proof to support this unsworn assertion; therefore, I have disregarded it.

[6] Kinslow seems to believe that it is inappropriate to consider the second escape because he was never convicted of that crime and therefore must be presumed innocent. He was not prosecuted for the second escape because conviction on this charge would not have had any practical effect on his sentence given that he had already been sentenced to eleven consecutive life terms, requiring him to serve approximately 300 years in prison. (Doc. 172 Ex. B.). There is no doubt that he committed the escape—two appellate court decisions detail the crimes he perpetrated after the escape. *See United States v. Kinslow*, 860 F.2d 963, 965 (9th Cir. 1988); *State v. Kinslow*, 799 P.2d 844, 845-46 (Ariz. 1990).

VI, and his assertion that the conditions at certain lower levels are "the exact opposite." (Doc. 178 at 5.) By considering Kinslow's descriptions in conjunction with the prison policies included in the *Martinez* report, it is possible to undertake a meaningful analysis of whether Kinslow's conditions were extreme.

Kinslow complains about the following conditions of administrative segregation: (1) being kept in 23-hour-per-day solitary confinement 5 days per week and 24-hour-per-day solitary confinement 2 days per week; (2) being handcuffed behind his back and leg-ironed any time he left his cell; (3) not being allowed to interact with other prisoners; (4) having his personal property severely limited; (5) eating all meals alone; (6) taking only 1-hour of outside recreation 5 days a week in a fenced cage smaller than his cell; and (7) not being allowed to attend religious services or go to libraries and educational and work programs.

These conditions are generally consistent with the description of Level VI conditions in the policies submitted by the NMCD Defendants.[7] Accordingly, the conditions experienced by Kinslow were not extreme in comparison with those experienced by all Level VI prisoners.

I assume that prisoners in the general population at Levels III and below are not isolated, are not restrained when leaving their cells, and have greater access to personal property, libraries, and group recreation, religious observance, and educational and work programs. Nevertheless, after considering the conditions experienced by Kinslow in comparison with non-segregated prisoners and

---

[7] Although Kinslow complains about not being able to visit the library or to participate in religious services or work and educational programs with other inmates, he does not contend that he was denied all access to these privileges. The policies indicate that Kinslow had access to library books, religious items and visits, and educational programming in his cell.

in light of relevant case law, I conclude that the conditions were not extreme enough to create a liberty interest in avoiding them.

In *DiMarco*, the Tenth Circuit found no liberty interest where the inmate was segregated in the prison's most restrictive housing unit for her entire 14-month incarceration.  *See* 473 F.3d at 1336.  DiMarco's cell had fewer amenities than the general population cells.  In addition, she was given only two sets of clothing rather than the five sets given to inmates in the general population; she had to eat all her meals in her cell, sitting on the bed or toilet because the cell did not have a table or chair; she was allowed access to the gymnasium only when a guard could transport her and the facility was not being used by other prisoners; and she was generally not allowed to participate in activities, such as education programs, that would put her in contact with other inmates.  She did, however, have frequent access to prison staff and medical personnel and weekly contacts with her caseworker.  DiMarco also participated in two small treatment groups, which met for one hour counseling sessions each week.  *Id.* at 1337-38.  The Tenth Circuit concluded that although DiMarco's conditions of confinement were "spartan," they were "not atypical of protective custody." *Id.* at 1343.  The court noted that although she was denied interaction with other inmates, she had access to the basic essentials of life, as well as to library, recreational, and religious opportunities, and she participated in out-of-cell time at least five-and-one-half hours a day.  *Id.*  In reaching its conclusion, the court stated that a prisoner does not have a right to access every type of program available to other inmates, ranging from work to recreation.  *Id.*

Admittedly, DiMarco had more contact with other people and more time outside her cell than Kinslow did.  But her situation was similar to Kinslow's in that she had to eat her meals alone and could not participate in group activities or otherwise interact with other inmates.

A Sixth Circuit case is more analogous to this one.  *See Jones v. Baker*, 155 F.3d 810 (6th Cir. 1998).  Jones was segregated for two-and-a-half years during an investigation into his role in a prison riot.  *Id.* at 812.  While in segregation, he was denied work assignments, educational and vocational opportunities, and the ability to interact freely with other inmates.  *Id.* at 815 (Gilman, J., concurring).  Additionally, his recreational, visitor, telephone, and radio privileges were reduced and he was required to eat his meals alone.  *Id.*  The court concluded that these conditions were not atypical and significant.  *Id.* at 813.  The Tenth Circuit has cited this case with approval.  *See, e.g., DiMarco*, 473 F.3d at 1341 n.5.  Other courts have found no liberty interest on similar facts.  *See, e.g., Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (six-month segregation; cell was unsanitary and hot; inmates permitted to leave cell only three or four times per week; no outside recreation and no educational or religious services available; smaller portions of food than in general population); *Griffin v. Vaughn*, 112 F.3d 703, 706-08 (3rd Cir. 1997) (fifteen-month segregation; no freedom to engage in programs with the general population; no access to radios, televisions, telephone calls (except emergency or legal), personal property, or commissary (except writing materials); access to library books by request; exercise for one hour per day five days per week).  In fact, the Tenth Circuit has never found the conditions of administrative segregation extreme enough to create a liberty interest in any of the cases it has considered.  *See Ajaj v. United States*, No. 07-1073, 2008 WL 4192738, at *10 (10th Cir. Sept. 15, 2008) (unpublished).[8]

---

[8] Kinslow claims that after being assigned to Level IV, he was in solitary confinement for 21 hours a day; that he was only allowed out of his cell for one hour of morning tier time, one hour of afternoon tier time, and one hour of outside recreation in a small, fenced cage; and that he was denied virtually all forms of "congregate" activities that are allowed to prisoners in the general population.  (Doc. 178 at 2.)  For example, he was denied group worship, work details, and group recreation (except with the seven other prisoners on his tier), denied the ability to go to the libraries, and received all meals in his cell.  Having concluded that the more onerous conditions of Level VI were not extreme, I necessarily conclude that these conditions also were not.

As for *DiMarco*'s third factor, there is no evidence that Kinslow's classification and placement in administrative segregation increased the overall duration of his confinement. (*See* Doc. 122 at 25-26.)

*DiMarco*'s fourth and final factor is whether the placement is indeterminate. Although the prison policies set a minimum time for segregation, they do not contain a maximum time. Therefore, Kinslow's segregation was indeterminate when it started. But the segregation is not indeterminate now because he was released in January 2007. In evaluating whether DiMarco's segregation was indeterminate, the Tenth Circuit contrasted her situation with the situation in *Wilkinson v. Austin*, 545 U.S. 209 (2005). *See DiMarco*, 473 F.3d at 1342-43. In *Wilkinson*, the prisoner's placement in a "supermax" prison was for an indefinite duration and was only reviewed on an annual basis. 545 U.S. at 224. DiMarco's segregation, in contrast, was reviewed every ninety days. *DiMarco*, 473 F.3d at 1343. Similarly, Kinslow's segregation was reviewed weekly or monthly for approximately one year and thereafter on a more *ad hoc* basis.

In summary, having considered all of the *DiMarco* factors and the length of Kinslow's segregation, I conclude that his segregation was not atypical and significant enough to create a liberty interest.

### *Adequate Procedural Protections*

Even assuming that Kinslow had a liberty interest in avoiding segregation, I concluded in my previous PFRD that he was provided all the process to which he was due when he was initially classified at Level VI and placed in administrative segregation. I now similarly conclude that his segregation was meaningfully reviewed.

15

The Supreme Court has stated that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate [and that] [p]rison officials must engage in some sort of periodic review of the confinement of such inmates." *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983), *abrogated in part on other grounds by Sandin*, 515 U.S. at 479-84; *United States v. Johnson*, 223 F.3d 665, 673 (7th Cir. 2000) ("The Bureau of Prisons could not . . . commit a prisoner to the control unit for life, refusing to consider circumstances that might render his joining the open population of the prison harmless . . . ."); *see also DiMarco*, 473 F.3d at 1344 (concluding that DiMarco received due process partly because "the prison provided periodic and meaningful reviews of her status").

In evaluating whether Kinslow's segregation was meaningfully reviewed, I first note that prison officials clearly did not comply with their own policies for reviewing administrative segregation. Although the prison officials' repeated failure to adhere to established policies is very troubling, it does not in itself constitute a due process violation. *See Lusero v. Welt*, 223 F. App'x 780, 783 (10th Cir. 2007); *DiMarco*, 473 F.3d at 1341; *Hulen v. Yates*, 322 F.3d 1229, 1247 (10th Cir. 2003).

The record reflects that Kinslow's segregation was reviewed weekly or monthly for approximately one year. After the last monthly review in September 2005, approximately six months apparently passed before the next review in April 2006. The committee recommended that Kinslow be released from Level VI. This recommendation was acted upon in January 2007.

These reviews were minimally sufficient to satisfy due process. In *Hewitt*, the Court stated that prison officials do not have to permit the submission of additional evidence or statements during a review because "[t]he decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner—which will have been ascertained when determining to confine the

16

inmate to administrative segregation—and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for 'proof' in any highly structured manner." 459 U.S. at 477 n.9. The Court held that one review occurring less than one month after the beginning of an inmate's six-month segregation "was sufficient to dispel any notions that the confinement was a pretext." *Id.* Prison officials were not required to advance Kinslow to higher steps or release him to the general population based on his good behavior, despite his escape history and other legitimate considerations. Due process does not guarantee a particular result. *See Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 534 (10th Cir. 1998).[9]

## MEDICAL CLAIMS

### Transport

Kinslow alleges that his HCV treatment was interrupted when he was transferred from Illinois to New Mexico and that the treatment failed as a result. (Doc. 1 at 7, 14.) He claims that the NMCD Defendants did not request that the transporting company follow the protocol for "special needs" prisoners. (Doc. 179 at 2.) Consequently, no medical personnel were available and no arrangements were made to ensure that Kinslow's medication would be properly administered during the six-day trip. (*Id.* at 2-3; Doc. 106 at 3-4.)

---

[9] I also find no evidence that Kinslow was segregated in retaliation for exercising his right of access to the courts. His escape history is a legitimate, nonretaliatory basis for the segregation. Prison officials' subsequent decisions to keep him segregated do not share a temporal proximity with Kinslow's previous litigation in Illinois or with relevant events in the procedural history of this case. If anything, it appears that Kinslow's progress through Level VI and his release to Level IV may have been expedited by events in this case. I note that the April 10, 2006 review occurred approximately one month after this Court ordered Kinslow to show cause why this case should not be dismissed for failure to exhaust administrative remedies and his release to Level IV occurred during the time that the NMCD Defendants were required to submit their first *Martinez* report addressing Kinslow's classification claims.

In the unsworn narrative portion of the *Martinez* report, counsel for the NMCD Defendants asserts, "There was no interruption of Kinslow's medical treatment during the transfer from Illinois to New Mexico." (Doc. 170 at 5.)  The *Martinez* report includes a memo from Defendant Pullara, stating that Kinslow's case was presented to the Hepatitis C Treatment Review Committee in October 2004.  The form generated from this meeting and signed by Pullara states, "Patient has been on treatment for several months in Illinois.  Their pre-treatment workup is different from ours, therefore, the above workup will be completed [psychiatric and addiction services evaluations] and in the meantime we will continue his treatment.  His medication dosage was adjusted . . . ." (*Id.* Ex. 2G at 2-3.)

These documents demonstrate that the HCV treatment that Kinslow was receiving in Illinois was continued upon his arrival in New Mexico.  Kinslow does not dispute this, nor does he argue that the HCV treatment he received in New Mexico was inadequate (except for its early termination, which is discussed below).  However, the documents do not demonstrate that Kinslow's treatment was continued during his trip from Illinois to New Mexico.  Kinslow has sworn under penalty of perjury that his treatment was interrupted during the trip.  I must accept that fact for purposes of considering summary judgment.  Nevertheless, the record reveals a basis for granting summary judgment on this claim for the NMCD Defendants, although they failed to raise it.

The defendant's personal participation in the challenged act is an essential element of a § 1983 claim.  *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996).  Because government officials are not vicariously liable for a subordinate's violation of a person's constitutional rights, a plaintiff must do more than show that a defendant was in charge of others who committed a constitutional violation.  *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006).  "[T]he plaintiff must establish

a deliberate, intentional act by the supervisor to violate constitutional rights." *Id.* (internal punctuation omitted). "In short, the supervisor must be personally involved in the constitutional violation, and a sufficient causal connection must exist between the supervisor and the constitutional violation." *Id.* (internal punctuation omitted). The plaintiff must establish that the supervisor actively participated or acquiesced in the constitutional violation. *Id.* Furthermore, mere negligence is insufficient; the plaintiff must establish that the supervisor acted knowingly or with deliberate indifference that a constitutional violation would occur. *Id.*

The first *Martinez* report contains an affidavit by Shannon L. McReynolds, who identifies himself as an NMCD general manager. (Doc. 98 Ex. 2.) The affidavit states that McReynolds supervises the implementation of the Interstate Corrections Compact. In September 2004, he was contacted by Pullara, who informed him "that Inmate Kinslow would be returned to New Mexico due to his hepatitis C condition." (*Id.*) After speaking with Pullara, McReynolds made the arrangements to have Kinslow transferred back to New Mexico, including contacting the transport company. Attached to the affidavit is a letter from McReynolds to the transport company, authorizing the company to transport Kinslow from Illinois to New Mexico. (*Id.* Ex. 2A.) The affidavit states that Defendant Sedillo had no involvement in Kinslow's transfer to New Mexico, other than being McReynolds's superior. (*Id.* Ex. 2.)[10]

McReynolds's affidavit is consistent with an affidavit by Pullara that was previously submitted by Kinslow. That affidavit states that Pullara "advised Mr. McReynolds that Mr. Kinslow should be returned to New Mexico . . . ." (Doc. 108 Ex. 1.)

---

[10] The affidavit was apparently prepared in connection with litigation Kinslow filed in the Northern District of Illinois. Sedillo and Pullara are the only NMCD Defendants who were also defendants in that litigation.

19

McReynolds's affidavit indicates that he alone was responsible for making the arrangements for Kinslow's transfer.  There is nothing to indicate that any of the NMCD Defendants, except Pullara, had any involvement in Kinslow's transfer.  Although the affidavits demonstrate that McReynolds was following Pullara's instruction to transfer Kinslow back to New Mexico, there is nothing to indicate that Pullara knew or was deliberately indifferent to whether Kinslow's constitutional rights would be violated during transport.  Accordingly, the NMCD Defendants are entitled to summary judgment on this claim.

### Dr. Cotler's Recommendations

Kinslow also faults the NMCD Defendants for failing to follow two recommendations of Dr. Cotler, a nonprison doctor who treated Kinslow while he was in Illinois.  First, Dr. Cotler advised that if Kinslow's viral load fell below 650 after twenty-four weeks of HCV treatment, the treatment should be continued for a total of eighteen months.  Second, he advised that Kinslow should be scheduled for a colonoscopy because of his right lower quadrant pain and intermittent diarrhea.  Kinslow has submitted a copy of a September 30, 2004 report containing these recommendations. (Doc. 178 Ex. 4.)  He avers under penalty of perjury that a complete set of his Illinois medical records was transported with him to New Mexico.  (Doc. 179 at 3.)  Despite Dr. Cotler's recommendations, Kinslow claims that his HCV treatment was terminated after only forty-eight weeks, even though his viral load met the target, and he has received no treatment for his intestinal problems, even though they have persisted since he returned to New Mexico.

In the *Martinez* report, the NMCD Defendants do not deny that they received Dr. Cotler's recommendations.  The narrative portion of the report acknowledges that Kinslow's HCV treatment lasted only forty-eight weeks, that he had a low count of diseased cells at the conclusion of the

treatment (indicating a positive response to the treatment), and that he had an extremely high count of diseased cells six months after treatment ceased (indicating a relapse). But they note that a term of forty-eight weeks is "the normal and recommended course to follow" and that relapses after seemingly successful treatment are not unusual in HCV cases. (Doc. 170 at 6.)

To prevail on a claim for inadequate medical care under the Eighth Amendment, a prisoner must establish that the defendants acted with deliberate indifference to his serious medical needs. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005); *see also Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). The claim has objective and subjective components. *Mata*, 427 F.3d at 751.

The objective component requires that "the deprivation at issue was in fact 'sufficiently serious.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Id.* Pain may be sufficiently serious to constitute a serious medical need. *See Mitchell*, 80 F.3d at 1444; *see also Franklin v. Kan. Dep't of Corr.*, 160 F. App'x 730, 735 (10th Cir. 2005) ("Franklin's claims of suffering severe pain for an extended period of time satisfy the objective component ....").

All the doctors involved in this case have acknowledged that Kinslow's HCV condition mandated treatment. Regarding his intestinal problems, Dr. Cotler recommended a colonoscopy and Kinslow has sworn that since 2004 he experiences "almost daily painful diarrhea, intestinal inflammation and swelling, sharp shooting pains in [his] left side, and periodic rectal bleeding." (Doc. 106 at 7.) This appears sufficient to satisfy the objective component.

The subjective component requires evidence that the defendants had a culpable state of mind. The prisoner must present evidence that they knew of and disregarded an excessive risk to his health,

21

*i.e.*, they were aware of facts from which they could draw the inference that a substantial risk of serious harm exists and they actually drew that inference. *Mata*, 427 F.3d at 751. Prison medical professionals who serve as gatekeepers for other medical personnel may be held liable under the deliberate indifference standard if they delay or refuse to fulfill that gatekeeper role. *Id.*; *see also Estelle*, 429 U.S. at 104-05. However, "the subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment. Matters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006). "The Eighth Amendment's prohibition on cruel and unusual punishment is not violated when a doctor simply resolves 'the question whether additional diagnostic techniques or forms of treatment [are] indicated.'" *Id.* (quoting *Estelle*, 429 U.S. at 107).

A prisoner's mere disagreement with a prescribed course of treatment does not amount to a constitutional violation. *See, e.g., Oxendine v. Kaplan*, 241 F.3d 1272, 1277 n.7 (10th Cir. 2001). Moreover, the failure of one doctor to follow the advice of another doctor does not constitute deliberate indifference. *See Stewart v. Murphy*, 174 F.3d 530, 535 (5th Cir. 1999).

The *Martinez* report contains medical records showing that Kinslow advised prison medical personnel that Dr. Cotler recommended a colonoscopy. The medical personnel treated his symptoms, but did not schedule a colonoscopy. (Doc. 170 Ex. 2G various unnumbered pages.) There is nothing to indicate that the refusal to schedule a colonoscopy amounted to deliberate indifference. Instead, it appears to be an exercise of medical judgment.

A similar analysis applies to Kinslow's claim that his HCV treatment was terminated too early. The NMCD Defendants have established that the prison protocol only requires forty-eight weeks of

22

treatment.  (*See* Doc. 170 Ex. 2.)  Because they followed that protocol, Kinsow cannot establish

deliberate indifference.  *See Free v. Unknown Officers of the Bureau of Prisons*, 103 F. App'x 334,

337 (10th Cir. 2004).

### PRELIMINARY INJUNCTIVE RELIEF

On July 30, 2008, Kinslow filed a Motion for Preliminary Injunction and/or Temporary

Restraining Order.  (Doc. 181.)  This motion states that on July 12, 2008, he was involuntarily

returned to administrative segregation because a threat was allegedly made against him.  Kinslow

argues that there is no credible evidence of a threat and that the NMCD Defendants are simply

retaliating against him because he has sued them.  He also argues that the NMCD Defendants used

his segregation as a basis to take away some of his legal files, including law books and documents 10

through 140 in this case.  He seeks an order directing them to return his legal files and an order

releasing him from administrative segregation or requiring the NMCD Defendants to produce

evidence of the threat.

Kinslow filed a similar motion in another case pending in this Court.  At an evidentiary hearing

on August 26, 2008, he withdrew the motion, acknowledging that his safety was threatened.  *See*

*Kinslow v. N.M. Corr. Dep't*, No. CV 07-1164 MV/RLP (Doc. 39, 41).  I take judicial notice of the

proceedings in that case.

To be entitled to a temporary injunction, Kinslow must prove: (1) a substantial likelihood of

success on the merits of the case; (2) irreparable injury if the injunction is denied; (3) the threatened

injury to him outweighs the injury to the other party if the injunction is granted; and (4) the injunction

is not adverse to the public interest.  *See Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001).

23

Because a temporary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal. *See id.*

Kinslow's admission that his safety is under threat negates his attempt to satisfy the first factor. He has not demonstrated that segregation in itself constitutes an irreparable injury. And he cannot demonstrate that he was injured by losing access to the legal materials, given that all the relevant filings in this case were made before his segregation. Thus, he has not satisfied the second factor. The injunctive relief he seeks would be adverse to the public interest. The Supreme Court has stated, "It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973). States have an important interest "in not being bypassed" in correcting problems within their prisons. *Id.* at 492. Accordingly, Kinslow has not satisfied the third and fourth factors. I therefore recommend that Kinslow's motion for injunctive relief be denied.

## CONCLUSION

For the reasons stated above, I recommend that:

1) Kinslow's Motion for Preliminary Injunction and/or Temporary Restraining Order (Doc. 181) be denied;

2) Kinslow's Motion for Evidentiary Hearing and for Court Appointment of Mediator (Doc. 180, 183) be denied; and

3) summary judgment be granted in favor of the NMCD Defendants on Kinslow's remaining claims.

> **THE PARTIES ARE NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636 (b)(1). **A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.

25